PAG
X6495
MAD

AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
Southern District of California

In the Matter of the Search of  )
*(Briefly describe the property to be searched*  )
*or identify the person by name and address)*  )
)   Case No. '23 MJ2540
Blue Apple iPhone 12  )
Seized as FP&F No. 2023565500030501  )
("Target Device")  )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the ___Southern___ District of ___California___, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 8, U.S.C. § 1324 | Alien Smuggling |

The application is based on these facts:
See Attached Affidavit of Border Patrol Agent Shawna M. Wilson, incorporated herein by reference.

☑ Continued on the attached sheet.
☐ Delayed notice of _____ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Shawna M. Wilson, Border Patrol Agent, U.S. Border Patrol
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by ___telephone___ *(specify reliable electronic means)*.

Date: 07/14/2023

*Judge's signature*

City and state: San Diego, California

HON. Daniel E. Butcher, U.S. Magistrate Judge
*Printed name and title*

# ATTACHMENT A-1

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Grey Apple iPhone
Seized as FP&F No. 2023565300062501
**("Target Device 1")**

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

11

## **ATTACHMENT B**

## ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 and A-2 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **June 12, 2023, through July 12, 2023**:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States; and transport aliens inside the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

## **ATTACHMENT A**

## PROPERTY TO BE SEARCHED

The following property is to be searched:

Blue Apple iPhone 12
Seized as FP&F No. 2023565500030501
**("Target Device")**

Target Device is currently in the custody of the Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

## ATTACHMENT B

### ITEM TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone for evidence described below. The seizure and search of the cellular telephone shall follow the search methodology described in the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephones will be electronic records, communications, and data such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data, for the period of **June 12, 2023, through July 12, 2023**:

a.  tending to indicate efforts to smuggle aliens from Mexico into the United States; and transport aliens inside the United States;

b.  tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c.  tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d.  tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e.  tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f.  tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above,

which is evidence of violations of Title 8, United States Code, Section 1324.

# AFFIDAVIT

I, Shawna M. Wilson, being duly sworn, hereby state as follows:

## INTRODUCTION

1. I submit this affidavit in support of an application for warrants to search the following electronic devices:

> Blue Apple iPhone 12
> Seized as FP&F No. 2023565500030501
> **("Target Device")**

the "**Target Device**", as further described in Attachment A, and to seize evidence of crime, specifically, violations of Title 8, United States Code, Section 1324 (Alien Smuggling), as further described in Attachment B.

2. The requested warrant related to the investigation and prosecution of Cristian MONROY-Aguirre for transporting and moving illegal aliens within the United States. The **Target Device** is currently in the custody of Department of Homeland Security, Customs and Border Protection, United States Border Patrol, San Diego Sector.

3. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested warrants and does not purport to set forth all my knowledge of the investigation into this matter. Dates and times are approximate.

## TRAINING AND EXPERIENCE

4. I have been employed by the USBP since 2019 and am currently assigned to the San Diego Sector Prosecutions Unit. I graduated from the Border Patrol Basic Academy at the Federal Law Enforcement Training Center in Artesia, New Mexico. I am a Federal Law Enforcement Officer within the meaning of Rule 41(a)(2)(C), Federal Rules of Criminal Procedure and have been a Federal Law Enforcement Officer for four years. I am authorized by Rule 41(a) Federal Rules of Criminal Procedure to make applications for

search and seizure warrants and serve arrest warrants. I have experience and have received training with respect to conducting investigations of immigration and criminal violations of Titles 8, 18, 19, and 21 of the United States Code.

5. My current duties involve the preparation of criminal and administrative cases for prosecution, including the use of linking related subjects and information via electronic equipment and telephones. In the course of my duties, I investigate and prepare for prosecution cases against persons involved in the inducement, transportation, and harboring of illegal aliens into and within the United States; and, the utilization of illegally-obtained, counterfeit, altered or genuine immigration documents by illegal aliens to illegally gain entry or remain in the United States.

6. During my tenure as a Border Patrol Agent, I have participated in the investigation of a number of cases involving the smuggling of aliens from Mexico into the United States and transportation of illegal aliens within the United States, which have resulted in the issuance of arrest warrants, search warrants, seizure warrants, and the indictments of persons for alien smuggling, including drivers, passengers, and guides.

7. Through the course of my training, investigations, and conversations with other law enforcement personnel, I have gained a working knowledge of the operational habits of alien smugglers and alien transporters, in particular those who attempt to smuggle aliens into the United States from Mexico and transport them throughout the Southern District of California. I am aware that it is a common practice for alien smugglers to work in concert with other individuals and to do so by utilizing cellular telephones to maintain communications with co-conspirators and/or illegal aliens in order to further their criminal activities. Because they are mobile, the use of cellular telephones permits alien smugglers and transporters to easily carry out various tasks related to their smuggling activities, including, *e.g.*, remotely monitoring the progress of the aliens while the aliens are in transit, providing instructions to transporters, guiding aliens to specific pick up locations, warning accomplices about law enforcement activity in the area and the status of check-point

operations, and communicating with co-conspirators who guide aliens, coordinate drop off locations, and/or operate alien stash houses.

8. The smuggling of aliens generates many types of evidence, including, but not limited to, cellular phone-related evidence such as voicemail messages referring to the arrangements of travel, names, photographs, text messaging (via SMS or other applications), and phone numbers of co-conspirators and illegal aliens. For example, drivers and passengers responsible for transporting illegal aliens are typically in telephonic contact with co-conspirators immediately prior to and/or following the crossing of the illegal aliens at the border, at which time they receive instructions, including where to pick-up the illegal aliens for transportation into the United States and where to take the illegal aliens after crossing into the United States. These communications may also include locations for delivery to stash houses and/or sponsors. Illegal aliens also are typically in telephonic contact with co-conspirators prior to and following their crossing in order to make smuggling arrangements, receive instructions, and report their locations after crossing. It is common for alien smugglers to be in contact with co-conspirators weeks to months in advance of an event to recruit drivers and to coordinate the event. It is also common for co-conspirators to continue to contact each other by phone calls, social media, or messaging applications when contact is lost with the driver after an apprehension has occurred.

9. Based upon my training, experience, and consultations with law enforcement officers experienced in human smuggling investigations, and all the facts and opinions set forth in this affidavit, I know that cellular telephones (including their Subscriber Identity Module (SIM) card(s)) can and often do contain electronic evidence, including, for example, phone logs and contacts, voice and text communications, and data, such as emails, text messages, chats and chat logs from various third-party applications, photographs, audio files, videos, and location data. In particular, in my experience and consultation with law enforcement officers experienced in alien smuggling investigations,

I am aware that individuals engaged in alien smuggling may store photos and videos on their cell phones that reflect or show co-conspirators and associates engaged in alien smuggling, as well as images and videos with geo-location data identifying alien smuggling transportation routes, and communications to and from recruiters and organizers.

10. This information can be stored within disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephone. Specifically, searches of cellular telephones may yield evidence:

a. tending to indicate efforts to smuggle aliens from Mexico into the United States, and transport aliens inside the United States;

b. tending to identify accounts, facilities, storage devices, and/or services– such as email addresses, IP addresses, and phone numbers–used to facilitate alien smuggling and transportation of smuggled aliens;

c. tending to identify co-conspirators, criminal associates, or others involved in alien smuggling, or transportation of smuggled aliens;

d. tending to identify travel to or presence at locations involved in the smuggling, transportation, or harboring of illegal aliens, such as stash houses, load houses, or delivery points;

e. tending to identify the user of, or persons with control over or access to, the Target Device(s); and/or

f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

## FACTS SUPPORTING PROBABLE CAUSE

11. On July 12, 2023, Border Patrol Agent J. Velasquez was performing assigned duties in the Campo Border Patrol Station's area of responsibility. Agent Velasquez was wearing plain clothes with his Border Patrol issued vest clearly displaying all patches and

insignia. Agent Velasquez was driving an unmarked agency vehicle with fully functioning emergency lights and sirens.

12.     At approximately 7:20 AM, Border Patrol Agent G. Whalen identified a silver Chevrolet Malibu traveling eastbound on State Route 94 (SR-94). Agent Whalen notified Agent Velasquez that the Malibu was last seen traveling eastbound on SR-94 near the city of Potrero, California. Agent Whalen conducted records checks on the Malibu, which revealed that it was registered out of Fontana, California with no prior crossings through any Port of Entries or Border Patrol Checkpoints, indicating this is likely the first time the vehicle has traveled through the area. The city of Fontana is approximately 150 miles from the city of Potrero, and in Agent Whalen's experience, it is common for alien smugglers to use vehicles registered out of those areas because they are often close to the final destinations for illegal aliens.

13.     At approximately 7:33 AM, BPA Velasquez began driving south on Buckman Springs Road towards SR-94. While driving south on Buckman Springs Road, Agent Velasquez observed the Malibu pass him traveling northbound. As the Malibu passed him, Agent Velasquez observed only one individual, later identified as the defendant, Cristian MONROY Aguirre, inside of the Malibu. Agent Velasquez then proceeded to follow the Malibu, and watched the Malibu make a left turn onto Old Buckman Springs Rd. Both Campo Border Patrol Station checkpoints, were operational. As Agent Velasquez began following the Malibu towards the Border Patrol Checkpoint on Old Highway 80, he notified the agents at the Old Highway 80 checkpoint that the Malibu was heading towards their location. As the Malibu began to pass multiple signs advising that the Border Patrol Checkpoint was operational, the Malibu pulled off to the side of the road, approximately 50 yards before the checkpoint. Agent Velasquez then observed the Malibu make an abrupt U-turn before entering the primary inspection area. Agent Velasquez also performed a U-turn and began traveling back east on Old Highway 80 to follow the Malibu. Agent Velasquez notified other agents of the suspicious U-turn at the checkpoint and requested a

marked Border Patrol unit to assist with a vehicle stop. As the Agents followed the Malibu, they observed it was driving noticeably faster to the point where the Agents were having a difficult time maintaining visibility. Agent Velasquez then proceeded to notify agents at the Interstate 8 Border Patrol checkpoint that vehicle had entered the westbound lanes on Interstate 8 and was heading towards them.

14. Supervisory Border Patrol Agent J. Karel and Border Patrol Agents N. Soto, D. Zamora, and C. Morales were all assigned to the Interstate 8 westbound Border Patrol Checkpoint. The Interstate 8 Checkpoint was fully operational with all lights and signs indicating to the public to slow down and prepare to stop. In addition, Border Patrol Agent Canine Handler J. Pina and his K9 partner were also assigned to work the Interstate 8 Checkpoint. As the Malibu began to approach the primary inspection location, Agent Pina began to approach the Malibu, and his K9 partner indicated a positive alert to the Malibu. Agent Pina attempted to make verbal contact with MONROY, but before contact was made, MONROY drove around a nearby Border Patrol vehicle and fled the checkpoint at a high rate of speed. Agent Zamora observed the Malibu attempting to flee and deployed a vehicle immobilization device (VID). After a successful spike of the tires, the Malibu continued to flee westbound on Interstate 8. Agents Velasquez again began to follow the Malibu.

15. After exiting into the city of Pine Valley, California the Malibu made another right turn onto Oak Lane and appeared to yield. In an attempt to stop the Malibu from fleeing again, Agent Velasquez activated his lights and siren then began to exit his vehicle and approach the Malibu. As Agent Velasquez began exiting his vehicle, the Malibu drove off again, traveling at approximately 40 miles per hour through a residential neighborhood. A few minutes later, the Malibu stopped again as the passenger door opened and one individual, later identified as material witness, Mario BARRERA-Garcia, exited the Malibu and began running westbound towards a residence. As BARRERA exited, the Malibu once again attempted to flee the scene. Agent Velasquez began pursuing

BARRERA on foot and instructed other agents to follow the Malibu. Agent Velasquez was able to successfully apprehend and detain BARRERA.

16. Agents Nunez, Zamora, and Morales continued to follow the Malibu, and shortly after, the Malibu came to a stop and gave MONROY commands to exit the Malibu. MONROY complied and was detained. Agent Velasquez then conducted an immigration inspection of MONROY. MONROY stated that he was a United States Citizen. Agent Velasquez then conducted an immigration inspection of BARRERA. BARRERA stated that he is a citizen of Mexico without any immigration documents allowing him to enter or remain in the United States legally. At approximately 7:56 AM, Agent Velasquez placed MONROY and BARRERA under arrest.

17. At the time of arrest, a blue Apple iPhone 12 **(Target Device)** was found driver's seat. MONROY claimed the cell phone **(Target Device)** as his. This device was subsequently seized.

18. MONROY was advised of his Miranda Rights, and stated he understood his rights and was willing to speak without an attorney present. MONROY stated that a couple days ago, a mutual friend told him about a job opportunity. MONROY stated he was put in contact with another individual who coordinated this smuggling event. MONROY was told to travel to his pickup location and when arrived around 6:30 AM, an individual came from the bushes and got into his vehicle. MONROY stated that he knew alien smuggling was illegal and that he knew he was transporting illegal aliens when he was driving around the area, due to being so close to the border wall. MONROY stated that the pick up location was on a dirt road where no houses were visible. MONROY stated that the individual got into his vehicle and sat in the backseat. MONROY was then sent coordinates to guide him out of the area toward his destined location. MONROY stated that the route he originally took guided him towards a Border Patrol checkpoint.

19. MONROY stated that he got scared and made a U-turn before getting to the agents at the checkpoint. MONROY then drove towards the I-8 westbound lanes and saw

7

that he was heading towards another Border Patrol checkpoint. MONROY then contacted the smuggling coordinator and told him that he was already being followed and that he was going to get caught. The coordinator told MONROY to just keep driving. MONROY stated that when he got to the primary inspection, he tried to flee before agents could talk to him and tried to get away because he knew he was going to get caught. MONROY stated he knew that his tires got spiked, and that on the freeway, he believes he was going approximately 80-90 miles per hour. MONORY stated he exited the freeway at some point and the coordinator told him to get the individual out of the car. MONROY stated that he stopped to let the BARRERA out, but that he was having trouble unlocking the doors, so he drove off again. Shortly after, MONROY stated he was able to unlock the doors and let BARRERA out. MONROY stated he eventually stopped on his own and Border Patrol Agents apprehended him.

20.   BARRERA stated he is a citizen of Mexico without any immigration documents allowing him to enter or remain in the United States legally. BARRERA stated that smuggling arrangements were made prior to crossing. BARRERA stated that he was going to pay approximately $10,000 USD to be successfully smuggled into the United States. BARREA stated that on July 11, 2023, he crossed into the United States illegally. BARRERA further stated that he was instructed to walk north and wait for a gray sedan to pick him up. BARRERA stated that he walked two miles until he reached a road. BARRERA stated that in the early morning of July 12, 2023, a gray sedan approached him. BARRERA stated a male driver approximately, twenty-six years old with black wavy hair, waived at him to get in. BARRERA stated that he approached the vehicle and got in through the rear passenger door. Once in the vehicle, BARRERA stated that the driver instructed him to lay down in the back seat. BARRERA stated that soon after the vehicle approached some sort of inspection and the driver abruptly swerved side to side and took off. BARRERA stated that the driver exited the highway and attempted to open the door for him. After coming to a brief stop, BARRERA stated that the driver opened the front

8

passenger door and instructed him with hand signals to get out. BARRERA stated that he exited the vehicle and ran. BARRERA stated that he exited the vehicle because he was afraid it might flip over, BARRERA explained that he had heard loud screeching coming from the vehicle.

21.     Based upon my experience and training, consultation with other law enforcement officers experienced in human trafficking investigations, and all the facts and opinions set forth in this affidavit, I believe that telephone numbers, contact names, electronic mail (email) addresses, appointment dates, messages, pictures, and other digital information are stored in the memory of the **Target Device**.

22.     In light of the above facts and my experience and training, there is probable cause to believe that the defendant, was using the **Target Device** to communicate with others to further illegal entry into the United States. Based on my training and experience, it is also not unusual for individuals, such as the defendant, to attempt to minimize the amount of time he was involved in smuggling activities, and for the individual to be involved for weeks and months longer than he claims. Accordingly, I request permission to search the **Target Device** for data beginning on **June 12, 2023, through July 12, 2023**.

## METHODOLOGY

23.     It is not possible to determine, merely by knowing the cellular telephones' make, model and serial number, the nature and types of services to which the devices are subscribed and the nature of the data stored on the devices. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the devices may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network.

Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device.

24. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the devices may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the devices manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

25. Following the issuance of these warrants, a case agent familiar with the investigation will collect the subject cellular telephone and subject it to analysis. All forensic analysis of the data contained within the telephones and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of these warrants.

26. Based on the foregoing, identifying and extracting data subject to seizure pursuant to these warrants may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days from the date this warrant is signed, absent further application to this court.

**PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE**

27. Law enforcement has not previously attempted to obtain the evidence sought by these warrants.

## CONCLUSION

28. Based on the facts and information set forth above, there is probable cause to believe that a search of the **Target Device** will yield evidence of alien smuggling violation of Title 8, United States Code, Sections 1324.

29. Because the **Target Device** was seized at the time of the defendant's arrest; and have been securely stored since that time, there is probable cause to believe that such evidence continues to exist on the **Target Device**. As stated above, I believe that the appropriate date range for this search is from **June 12, 2023, through July 12, 2023**.

30. Accordingly, I request that the Court issue a warrant authorizing law enforcement to search the items described in Attachment A, and seize the items listed in Attachment B using the above-described methodology.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Shawna M. Wilson
Border Patrol Agent

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 14th day of July 2023.

Hon. DANIEL E. BUTCHER
United States Magistrate Judge

11